UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| KEITH ALAN OGBURN,<br><br>               Petitioner,<br><br>   v.<br><br>TIM WENGLER and IDAHO ATTORNEY GENERAL LAWRENCE WASDEN,<br><br>               Respondents. | Case No. 1:12-cv-00290-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before the Court is Petitioner Keith Alan Ogburn's Petition for Writ of Habeas Corpus (Dkt. 3.) Respondents have filed an Answer and Brief in Support of Dismissal (Dkt. 12), and Petitioner has filed a Reply (Dkt. 13). Petitioner has also filed a Motion for Order to Augment Lodging of State Court Record (Dkt. 14), seeking a copy of a recording of the 911 call played at his trial.

Having carefully reviewed the record, including the state court record, the Court finds that the parties have adequately presented the facts and legal arguments in the briefs and record and that the decisional process would not be significantly aided by oral argument. Therefore, the Court shall decide this matter on the written motions, briefs and record without oral argument. D. Idaho L. Civ. R. 7.1(d). Accordingly, the Court enters the following Order denying Petitioner's Motion, denying the Petition, and dismissing

**MEMORANDUM DECISION AND ORDER  1**

this case.

# BACKGROUND

The description of the crime for which Petitioner is imprisoned can be found in the

decision of the Idaho Court of Appeals, which affirmed the state district court's judgment

denying Petitioner state post-conviction relief:

> On January 24, 2006, three masked men wearing dark clothing, one with a blue bandana, entered the Lotus Garden restaurant brandishing firearms. They demanded money from the owner, Hong Ha, and Ha's daughter, Karen, and threatened to shoot them if they did not comply. When the men realized that Hong's wife was on the telephone with the police in another portion of the restaurant, they fled the building, got into a white Pontiac Grand Prix, and sped away.

> The police soon located the automobile, and a high-speed chase ensued during which one or more of the Pontiac's occupants shot at the pursuing officers. The chase ended when the Pontiac's driver lost control and drove into an irrigation canal. The vehicle occupants fled on foot and avoided immediate apprehension. A short time later, however, [Petitioner] Keith Ogburn was found lying in a field and taken into custody. Johnny Gonzalez was arrested after he was discovered hiding in the weeds on the bank of the canal. He was sporting a blue bandana around his neck. About two and one-half hours after the search was initiated, [Frank] Gerardo was seen walking down a residential street near the crash scene and was also arrested. All three of the men were wearing dark clothing and were cold, muddy, and wet from the waist down.

> The three men were indicted for burglary, Idaho Code section 18-1404, and attempted robbery, I.C. §§ 18-6501, -306, and the indictment sought an enhancement of their burglary sentences for use of a firearm in the course of that crime, I.C. § 19-2520. The three men were tried together and none of them testified.

(State's Lodging D-3, pp. 1-2) (quoting *Idaho v. Gerardo*, 205 P.3d 671, 673 (Idaho

Court. App. 2009)).

The field where Petitioner was found was about half of a mile from the crash site.

**MEMORANDUM DECISION AND ORDER  2**

He was found approximately 45 minutes after the crimes, which occurred around 10:00 p.m. (*Id.*, p. 2.) In closing argument, Petitioner's counsel argued that he was not involved in the crimes; rather, he got high on methamphetamine and simply woke up in the field. (State's Lodging A-3, p. 778.) Petitioner's trial counsel also argued that some testimony of the police officers who found Petitioner was inconsistent and the evidence showed that Petitioner's pants were dryer than those of the other two men, suggesting that Petitioner had been outside longer. (*Id.*, p. 777-79.) Counsel pointed out that there were no fingerprints found at the scene, that the owners of the restaurant were never asked to identify Petitioner's voice, that several items that the robbers were carrying were never found, and that Petitioner is shorter than the eyewitness descriptions of the robbers. (*Id.*, 776-82.)

All three defendants were found guilty. Petitioner was initially sentenced to consecutive prison terms of 10 years with 5 years fixed for the burglary count; 15 years with 12 and one-half years fixed for the robbery count; and 15 years with 12 and one-half years fixed for a firearm enhancement. (*Id.*, p. 821.) Petitioner appealed his sentence, which the Idaho Court of Appeals affirmed. (State's Lodging B-4, p. 2.) Petitioner filed a petition for review in the Idaho Supreme Court. (State's Lodging B-5.) The petition was denied. Petitioner's sentence was later reduced to 10 years with five years fixed for burglary and 15 years with 7 and one-half years fixed for robbery; the firearm enhancement was vacated. (State's Lodging C-3, p. 10.)

Petitioner returned to the state trial court with a pro se post-conviction petition.

**MEMORANDUM DECISION AND ORDER  3**

(State's Lodging C-1, p. 18.) He was appointed post-conviction counsel, and Petitioner's second amended petition alleged that trial counsel was ineffective for failing to present an alibi defense and failing to object to the testimony of one of the police officers as violating the Confrontation Clause and the rule against hearsay. (*Id.*, p. 148-49.) After an evidentiary hearing, the trial court denied the petition. (*Id.*, p. 198-99.) The Idaho Court of Appeals affirmed. (State's Lodging D-3, p. 1.) Petitioner filed a petition for review with the Idaho Supreme Court, which was denied.

Petitioner filed his Petition for Writ of Habeas Corpus in this Court on April 17, 2013. He claims that his trial counsel was ineffective for not investigating, developing, and presenting an alibi defense.

Petitioner asserts that the decision of the Idaho Court of Appeals—that Petitioner was not denied his Sixth Amendment right to effective assistance of counsel—was both an unreasonable application of clearly established Supreme Court precedent and based on an unreasonable determination of the facts as presented in the state court proceeding. *See* 28 U.S.C. § 2254(d).

## DISCUSSION

**1.     Petitioner's Motion to Augment Lodging of State Court Records**

Petitioner requests that the Court order Respondents to lodge Exhibit 38 from his criminal trial, the recording of the 911 call alerting police to the robbery. Petitioner argues that

the data contained within the 911 recording is central to the issues at bar, and will

**MEMORANDUM DECISION AND ORDER  4**

provide unequivocal data upon which this Court can rely in the disposition of this case.

. . . .

Petitioner would state that this data would support the allegations of error & ineffective assistance of counsel, and that Respondent was put on notice that this data recording would be sought for inclusion in this case . . . , yet such was not included within the lodgings made by the respondents.

(Mot. to Augment, Dkt. 14, at 1-2) (brackets omitted).

Respondents state that the 911 call was admitted into evidence at trial and played for the jury, but "because the contents of the recording were not transcribed by the court reporter, the recording was not part of the trial transcript generated for Ogburn's direct appeal. Further, the clerk of the trial court did not lodge the audio recording with the Idaho Supreme Court . . . ." (Opp. to Mot. to Augment, Dkt. 15, at 2.) Respondents assert that they do not have the recording and that it is not a part of the record of either Petitioner's direct appeal or his appeal from the denial of his state petition for post-conviction relief. (*Id.* at 2-3.)

The Court will deny Petitioner's Motion. His stated reasons for seeking the recording are vague and general and do not support his request. Further, Petitioner "failed to develop the factual basis" in state court of any claim regarding the 911 call. 28 U.S.C. § 2254(e)(2). Therefore, the court cannot hold a hearing to take evidence regarding the recording unless Petitioner can show that (1) the "factual predicate [for a claim based on the 911 call] could not have been previously discovered through the exercise of due diligence" and (2) "the facts underlying the claim would be sufficient to establish by clear

**MEMORANDUM DECISION AND ORDER  5**

and convincing evidence that but for the constitutional error, no reasonable factfinder would have found [Petitioner] guilty of the underlying offense." *Id.* Petitioner fails to explain how the recording of the 911 call would support his claim of ineffective assistance of trial counsel. He also does not attempt to justify his failure to seek the recording at his post-conviction evidentiary hearing or to request that the recording be included in the state record on his direct or post-conviction appeal. Therefore, Petitioner's Motion will be denied, and the Court will proceed to the merits of the Petition.

**2.    Standard of Law**

Federal habeas corpus relief may be granted on claims adjudicated on the merits in a state court judgment when the federal court determines that the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A federal habeas court reviews the state court's "last reasoned decision" in determining whether a petitioner is entitled to relief. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).

Under § 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 (AEDPA), federal habeas relief is generally limited to instances where the state court's adjudication of the petitioner's claim

    (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

**MEMORANDUM DECISION AND ORDER  6**

28 U.S.C. § 2254(d).

When a party contests the state court's legal conclusions, including application of the law to the facts, § 2254(d)(1) governs. Section 2254(d)(1) has two clauses, each with independent meaning. That section consists of two alternative tests: the "contrary to" test and the "unreasonable application" test.

Under the first test, a state court's decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court] [has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002).

Under the second test, to satisfy the "unreasonable application" clause of § 2254(d)(1) the petitioner must show that the state court—although identifying "the correct governing legal rule" from Supreme Court precedent—nonetheless "unreasonably applie[d] it to the facts of the particular state prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 407 (2000). A federal court cannot grant habeas relief simply because it concludes in its independent judgment that the decision is incorrect or wrong; rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell*, 535 U.S. at 694.

The Supreme Court has clarified "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). This limitation applies to cases that were

**MEMORANDUM DECISION AND ORDER  7**

adjudicated on the merits in state court and to cases in which the factual determination of the state court is not unreasonable. *See Detrich v. Ryan,* 677 F.3d 958, 972 (9th Cir. 2012).

When a petitioner contests the reasonableness of the state court's factual determinations, a federal court must undertake a § 2254(d)(2) analysis. To be eligible for relief under § 2254(d)(2), the petitioner must show that the state court decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." The United States Supreme Court has admonished that a "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 130 S. Ct. 841, 849 (2010).

The United States Court of Appeals for the Ninth Circuit has identified four types of unreasonable factual determinations in state court proceedings: (1) when state courts fail to make a finding of fact; (2) when state courts mistakenly make factual findings under the wrong legal standard; (3) when "the fact-finding process itself is defective"; or (4) when state courts "plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim." *Taylor v. Maddox*, 366 F.3d 992, 1000-01 (9th Cir. 2004).

If the state court's decision was based on an unreasonable determination of the facts, then the Court is not limited by § 2254(d)(1), but proceeds to a de novo review of the petitioner's claims, which may include consideration of evidence outside the state

**MEMORANDUM DECISION AND ORDER  8**

court record. *See Detrich,* 677 F.3d at 972; *Maxwell v. Roe*, 628 F.3d 486, 494-95 (9th Cir. 2010).

### 3.      Post-Conviction Proceedings

Plaintiff claims that trial counsel should have investigated, developed, and presented an alibi defense. He states in his Petition that he informed his trial attorney, Mark McHugh, that he was attending a graduation ceremony at the time of the robbery, along with his then-girlfriend Chi Maestas and some of his family members.

McHugh testified at the evidentiary hearing in Petitioner's state post-conviction proceeding. By the time of the hearing, McHugh had been disbarred as a result of various violations of the Idaho Rules of Professional Conduct. (*See* Petition, Appen. A and B, Dkt. 3-2 and 3-3.) The grounds for McHugh's disbarment were as follows: (1) failing to provide an accounting; (2) failing to keep client funds in trust; (3) failing to refund advance payment of unearned fees; (4) failing to respond to a lawful demand for information in a disciplinary matter; (5) failing to abide by a client's decisions concerning the objectives of representation; (6) failing to act with reasonable diligence and promptness in representing a client; (7) failing to take steps to protect a client's interests upon termination of representation; (8) engaging in conduct prejudicial to the administration of justice; (9) charging an unreasonable fee; (10) failing to give notice to clients upon disqualification from the practice of law; and (11) engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation by accepting fees yet doing no work for a client. None of the disciplinary charges against McHugh related to his

**MEMORANDUM DECISION AND ORDER  9**

representation of Petitioner. (*See id*.) The state court briefly questioned McHugh at the evidentiary hearing regarding his disbarment:

> Q.   . . . . [W]as there anything in your suspension or your disbarment that pertained to your ability to represent clients in the past that was—that you were suffering from some sort of impairment, whether it be through mental health issues, substance abuse issues, anything of that nature, to your knowledge, that resulted in your disbarment?
>
> A.   Not to my knowledge.
>
> Q.   . . . . Was there anything during . . . the time you represented Mr. Ogburn [] that was impairing your ability to practice law in terms of whether it be substance abuse issues, mental health issues?
>
> A.   No, Your Honor.

(State's Lodging C-4, pp. 74-75.)

With respect to McHugh's representation of Petitioner, McHugh testified that he met with Petitioner around ten to fifteen times before trial. (*Id*., p. 25.) McHugh testified that Petitioner admitted to him prior to trial that Petitioner and his two co-defendants had met up *after* the graduation ceremony and decided "to go look for some drugs." (State's Lodging C-4, p. 43.) The group then picked up two more individuals and drove to the Lotus Garden restaurant. According to McHugh, Petitioner told him that "he didn't know that they were going in to try to get money but just to look for [Gonzalez's girlfriend] or somebody, I think, to get some money from—to go assist them in buying the drugs." (*Id*.) Petitioner and Gonzalez stayed in the car, while Gerardo and the two other individuals went into the restaurant; the three men later "came running out quickly, jumped in, and, you know, it was a mad rush out of there." (*Id*.)

**MEMORANDUM DECISION AND ORDER  10**

At the time McHugh was reviewing all of the evidence to determine a trial strategy, he was also aware that Special Agent Greg Johansson with the Bureau of Alcohol, Tobacco, Firearms, and Explosives had testified before the grand jury that on January 26, 2006—two days after the crimes—he interviewed Petitioner as part of an investigation involving a stolen gun. (*Id.*, p. 8-11.) Agent Johansson also testified at the post-conviction hearing and stated that he gave Petitioner *Miranda* warnings and explained to Petitioner that he was not going to ask Petitioner any questions about the events at the restaurant. (*Id.*, p. 11-12.) Nonetheless, Petitioner spontaneously told Agent Johansson that "he was there during the armed robbery of the Lotus Garden. He stated that he attempted to discourage one of the other participants from actually going through with the crime." (*Id.*, p. 14-15.)

McHugh testified that, because of the existence of Petitioner's two confessions (one of which potentially could have been used at trial, though ultimately it was not), he had to be careful about how he put together Petitioner's case. Additionally, McHugh knew that a co-defendant had told police officers that Petitioner was involved in the robbery. (State's Lodging A-3, pp. 1-5.)

McHugh also testified that around the same time that Petitioner confessed to him, McHugh also learned of Petitioner's potential alibi defense. Petitioner's girlfriend told McHugh that Petitioner was with her at the graduation ceremony at the time of the crimes. (State's Lodging C-4, pp. 44, 47-48.) Several members of Petitioner's family were also at the ceremony, although they could not remember the exact time they last saw

**MEMORANDUM DECISION AND ORDER  11**

Petitioner that night. If, as McHugh testified, Petitioner met up with his co-defendants *after* the graduation ceremony, McHugh knew that Petitioner's family and girlfriend could not possibly have provided him with an alibi for the time of the robbery.

McHugh testified that Petitioner had told the police yet another story: that "he got in an argument with his girlfriend, got upset, left, got high, then basically stumbled into the field and had passed out when the police found him." (*Id.*, p. 45.) According to McHugh, this is the story that Petitioner wanted his family to hear. (*Id.*) Considering these three possible avenues, McHugh, with Petitioner's input, decided to stick with the story Petitioner originally told the police. McHugh described his thought process as follows:

> And so the issue was, okay, I don't have any evidence of the alibi defense. I've got statements from him placing him at the scene at the time, or I've got his statements in his explanation to the officers as to why he was there at the time.
>
> Those were my—that's basically what I had to operate in looking at trial strategy. Do we want to place him there at all, or do we want to stick with his story that he just wandered there inadvertently?
>
> . . . .
>
> . . . . I posed to [Petitioner]: Here's what would happen if we changed and we went along this avenue, or this is what would happen if we stick with the story that you told the officers.
>
> And it was agreed between both of us that we would stick with the story he told the police officers.

(*Id.*, pp. 45-46.)

However, McHugh's recollection of what Petitioner told the police was not

**MEMORANDUM DECISION AND ORDER  12**

precisely accurate. According to the trial testimony of Detective Christopher Orvis (who found Petitioner in the field), Petitioner kept telling the officers he did not know how he got there, but eventually said that he "got high and woke up in the field." (State's Lodging A-3, p. 419.) It does not appear that Petitioner told the officers who found him that he had fought with his girlfriend.

Ms. Maestas also testified at the evidentiary hearing. She stated that the graduation ceremony ended "close to 10:00" at night, that she and Petitioner then went to her residence, and that they had "a good 20-minute, 30-minute argument." (*Id*., p. 106-07.) Ms. Maestas acknowledged, however, that she "wasn't really looking at the time because [she] was really angry." (*Id*.) She stated Petitioner "[t]ook off walking" after the argument. (*Id*., p. 108.) It was at this point, according to Petitioner, that he walked to the field where he was discovered by police. Although Ms. Maestas stated that the ceremony ended close to 10:00 p.m., her roommate at the time remembers Petitioner and Ms. Maestas coming back from the ceremony "about 9:00, 9:30 or so." (*Id*., p. 158.) When asked if the time might have been later than that, the roommate stated she did not know. (*Id*.)

Ms. Maestas testified that prior to trial, she informed McHugh that she was with Petitioner at the time of the robbery and that McHugh told her, Petitioner's sister, and Petitioner's mother that he would call them to testify. "But when we came for the trial, we all sat in here, and he never called us as witnesses." (*Id*., p. 101.)

Petitioner's mother, Jo Ellyn Ogburn, testified at the evidentiary hearing as well,

**MEMORANDUM DECISION AND ORDER  13**

identifying a photograph she took at the graduation ceremony that showed several people, including Petitioner. (*Id.*, p. 130) The photo was taken "sometime during the ceremony," but Ms. Ogburn was unsure of the exact time. (*Id.*, p. 136.) Like Ms. Maestas, Ms. Ogburn testified that she tried to talk to McHugh about the alibi defense but that she "couldn't get him to barely stop and give [her] any conversation at all." (*Id.*, p. 141.) Similarly, Petitioner's sister stated that she pressed McHugh on why she and the other family members were not being called as witnesses and that McHugh told her he "didn't need" them. (*Id.*, p. 169.)

Petitioner did not initially testify at the evidentiary hearing, but the court later reopened the hearing to allow him to do so. Petitioner testified that he never told McHugh or Agent Johansson that he was involved in the robbery. (State's Lodging C-6, pp. 18-19.) Petitioner claimed that he told McHugh "from the beginning" that he had an alibi and that on the night of the robbery he left the graduation ceremony around "10 o'clock, maybe, 9:50." (*Id.*, pp. 19, 25.) He then got into a fight with his girlfriend about his drug use and became paranoid when Ms. Maestas threatened to call Petitioner's parole officer. Petitioner heard sirens and "took off on foot." (*Id.*, p. 26.) Petitioner testified, "I was walking, and I walked down Garrity Boulevard, and I was going to call a friend to come get me. I seen [sic] police cars coming down Garrity like they are coming from downtown Nampa towards the freeway where I was at. And I ran through the Kia dealership. I thought they were coming for me, and that's how I ended up in the field next to the Kia dealership." (*Id.*, pp. 26-27.)

**MEMORANDUM DECISION AND ORDER  14**

Petitioner also testified, however, that he had been using methamphetamine for several days in a row and was high on the day of the robbery. (*Id.*, p. 37.) He had been awake for "most of the time" those past few days and stated he was high even when he went to babysit his sister's child before the graduation ceremony. (*Id.*) Petitioner stated that his perception of time could have been off "maybe a little bit" that day, but then testified, "I know what time the graduation was." (*Id.*, p. 38.)

Petitioner testified that he asked McHugh on multiple occasions to call his family and girlfriend at trial as alibi witnesses, but that McHugh refused, offering Petitioner multiple excuses, including that it was too late to present their testimony and that the judge would not allow it. (*Id.*, pp. 44-46.) Petitioner "never felt [McHugh] was even paying attention to what was going on at the trial." (*Id.*, p. 47.)

Petitioner responded to the trial court's questions about the path he took from his girlfriend's house to the field as follows:

> Q.    Now, you are walking to the—you had this fight with your girlfriend, and you are walking down Garrity Boulevard, and you are going through a car dealership, and you are seeing police car lights all around, hmm?
>
> A.    Yes.
>
> Q.    And so you find yourself out in this farm field, and it was dark?
>
> A.    Yes.
>
> Q.    And do you recall any other specifics about that path that you took from the girlfriend's house to where you were laying down out in that field? Anything else unusual happen?
>
> A.    I tripped in a little small ditch, kept on going.

**MEMORANDUM DECISION AND ORDER  15**

Q.      Okay. When you say you tripped in a little small ditch, okay. Anything
        unusual happen because you didn't see the ditch?

A.      And I got a little wet. My ankles.

Q.      Your ankles?

A.      My shins and my pants were a little wet.

. . . .

Q.      Now, as I recall, there was testimony that you were soaked from about mid-
        waist all the way down. Was that false testimony as well?

A.      I admit my pants were a little wet, but I wasn't soaked from the waist down.

Q.      Okay. So, again, I will review the record, but you would say that was an
        inaccurate statement if it was made?

A.      Yes.

(*Id.*, pp. 57-59.)

The state district court denied the petition for post-conviction relief in a written

decision. The court found that McHugh's testimony regarding the reasons for his defense

strategy and his decision not to present an alibi defense was credible:

> The Court, during the course of observing Mr. McHugh and evaluating his
> testimony, found that he had an independent recollection of his contact with Mr.
> Ogburn and that he had accurate knowledge of his conversations with Mr. Obgurn.
> The Court will further find that Mr. McHugh's credibility in this matter is far more
> credible than the testimony that was presented by Mr. Ogburn. In his testimony,
> Mr. McHugh summarized that he had met with Mr. Ogburn approximately ten to
> fifteen times in addition to talking to him on the telephone. Mr. McHugh testified
> clearly and succinctly that Mr. Ogburn had made admissions to him that after a
> graduation ceremony, he had gotten together with Johnny Gonzales and Frank
> Gerardo, the co-defendants, and that they were going to look for some drugs.
> Ogburn admitted to Mr. McHugh details of the attempted robbery and burglary in
> the course of their conversations. Additionally, the defendant admitted his

**MEMORANDUM DECISION AND ORDER  16**

presence at the crime not only to his counsel, but also to Special Agent Johansson in an interview at the Canyon County jail very shortly after the Petitioner was apprehended.

There is nothing in the record to indicate that Petitioner did not make these admissions other than the Petitioner's denial made some three years later in this proceeding. Special Agent Johansson testified under oath to the context and content of the admissions made by the Petitioner. His testimony was reflective of the information he documented in his report following this interview of the Petitioner. A true and accurate copy of the report was provided in discovery and was known to Mr. McHugh and the Petitioner. Mr. McHugh testified that he was aware of not only his client's admissions to Special Agent Johansson, but also believed, based on the Petitioner's statements to him, that the defendant was present and involved in this crime.

To present an alibi defense contradicting these clear admissions would have required Mr. McHugh to suborn perjury or at least elicit testimony that he believed to be untrue. Had Mr. McHugh placed an alibi defense at issue, then the statements made to Agent Johansson would have been admitted into evidence at trial.

(State's Lodging C-1, pp. 194-96.) The court noted that "if the Petitioner's admissions are true, his counsel Mr. McHugh would be ethically barred from presenting a defense that he knows is not true. . . . The Petitioner's 'alibi' defense was not an option for trial counsel to present to the jury because although the Petitioner had been at the graduation, he was at the graduation prior to these crimes." (*Id*., p. 196.)

In finding McHugh credible, the district court, somewhat surprisingly, did not discuss the fact that McHugh was disbarred for, among other things, "[c]onduct involving *dishonesty, fraud, deceit or misrepresentation*." (*See* Petition Appx. A at 13) (emphasis added). With respect to McHugh's disbarment, the trial court stated only that

Trial counsel Mark McHugh was questioned both by the Petitioner and by the Court regarding his disbarment. Mr. McHugh answered candidly and truthfully about the reason and timing of the bar disciplinary action against him. His [sic]

**MEMORANDUM DECISION AND ORDER  17**

testified that the disbarment was recent in time and that the underlying difficulties of depression began long after Petitioner's case. Mr. McHugh indicated that he was not suffering from depression back in 2006 when Petitioner's case went to trial. There is neither credible testimony nor any evidence before the Court to the contrary that Mr. McHugh was impaired during the time period he represented Petitioner.

(*Id.*, p. 194.)

However, as the transcript of the evidentiary hearing reveals, McHugh's testimony on this issue was not as extensive as the court's description makes it appear. The judge asked a few short questions about whether the disbarment was based on McHugh's representation of Petitioner and whether McHugh felt he was impaired during his representation of Petitioner. (State's Lodging C-4, pp. 74-75.) McHugh answered no. He did not testify that he had mental health or substance abuse issues. The state court's description of McHugh's disbarment may have been based on facts outside the record.[1]

Further, it is evident that the trial court's written decision denying the post-conviction petition was, in many respects, nearly identical to the State's briefing. (*Compare* State's Lodging C-1, pp. 194-98 *with* pp. 182-85.) This fact, along with the trial court's description of McHugh's testimony about his disbarment, seems to reflect that at least some of the court's factual findings were based on the briefing or on knowledge gained from other sources, rather than the record and the testimony at the evidentiary hearing.

---

[1] The court may have obtained information from McHugh's disciplinary records, but it is unclear whether the judge had access to all of those records at the time of the evidentiary hearing.

**MEMORANDUM DECISION AND ORDER  18**

The Idaho Court of Appeals was also skeptical of some of the district court's findings. In affirming the trial court's denial of post-conviction relief, the court recognized that "some of the district court's factual findings, adopted from the State's written closing argument, are not supported by the evidence." (State's Lodging D-3, p. 4.) The appellate court did not identify *which* of the trial court's findings it rejected, nor did it rely on any findings regarding the quality of McHugh's performance as counsel for Petitioner. Instead, the court assumed that McHugh's representation of Petitioner was constitutionally deficient and went on to consider only whether Petitioner was prejudiced by McHugh's choice to forego an alibi defense. (*Id*.)

The court of appeals reasoned that "[a]ny defense of Ogburn, no matter how skilled the attorney, was made extremely challenging by the facts surrounding his apprehension":

> On a January night the Grand Prix crashed into an irrigation canal with waist-deep water. Three individuals were seen running away. Many local law enforcement officers and vehicles responded to the scene. About forty-five minutes after the robbery, through use of a tracking dog, Ogburn was found lying down in a field adjacent to the canal, approximately one-half mile from the crash site. Ogburn was wet and muddy from the waist down. Although he was found near a ditch and culvert, neither had standing water. Ogburn's claim that his presence there at the time in question and his wet condition can all be explained as unfortunate coincidence is highly implausible.

(*Id*., pp. 5-6.)

The court then determined that Petitioner's alibi defense could not have overcome the evidence against him:

> Although precise timing of events was not well developed at the criminal

**MEMORANDUM DECISION AND ORDER  19**

trial, it appears that officers responded to the 911 call about 10:20 p.m. Ogburn's girlfriend's testimony concerning *the time he left her house* was equivocal; all she could say was that it "*had to be close to 10:00.*" The distance from the girlfriend's Nampa residence to the Meridian restaurant is but a few miles. Ogburn's other "alibi" witnesses did not provide an alibi at all for the time period when the robbery was committed; they would only have contradicted the State's evidence that Ogburn had dinner at the restaurant hours before the robbery. Finally, Ogburn's two-fold alibi defense was not supported by independent witnesses, but instead was dependent on the testimony of witnesses friendly to himself, namely his sister and girlfriend. Any jury would have evaluated their testimony with recognition of possible bias.

(*Id.*, p. 6) (emphasis added). An additional layer of either inaccurate factfinding or

imprecise language is evident in this statement, because Ms. Maestas actually testified

that she and Petitioner *left the graduation ceremony* close to 10:00, not that Petitioner left

her residence at that time. (State's Lodging, C-4, p. 107.)

**4.    Discussion**

**A.    Legal Standard for Ineffective Assistance of Counsel Claims**

The standard for ineffective assistance of counsel claims was identified in

*Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner asserting ineffective

assistance of counsel must show that (1) "counsel made errors so serious that counsel was

not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and

(2) those errors "deprive[d] the defendant of a fair trial, a trial whose result is reliable."

*Id*. at 687.

Whether an attorney's performance was deficient is judged against an objective

standard of reasonableness.  *Id.* at 687-88. A reviewing court's inquiry into the

"reasonableness" of counsel's actions must not rely on hindsight:

**MEMORANDUM DECISION AND ORDER  20**

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 689 (internal citations and quotation marks omitted).

An attorney who decides not to investigate a potential defense theory is not ineffective so long as the decision to forego investigation is itself objectively reasonable:

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690-91. "[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Id.* at 691.

*Strickland* gives a trial attorney wide discretion with respect to abandoning inconsistent defenses. *See Correll v. Stewart*, 137 F.3d 1404, 1411 (9th Cir. 1998)

**MEMORANDUM DECISION AND ORDER  21**

(holding that counsel's failure to develop a mens rea defense was reasonable because such a defense "would have conflicted with the primary defense theory of misidentification"); *Turk v. White*, 116 F.3d, 1264, 1267 (9th Cir. 1997) (holding that counsel's selection of self-defense theory was reasonable and obviated his need to investigate defendant's claim of incompetency). A mere difference of opinion as to trial tactics does not constitute a denial of effective assistance, *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not ineffective assistance simply because in retrospect it appears that better tactics were available, *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984).

If a petitioner shows that his counsel's performance was deficient, the next step is the prejudice analysis. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To satisfy the prejudice standard, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. As the *Strickland* Court instructed:

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of

**MEMORANDUM DECISION AND ORDER  22**

the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id.* at 695-96.

## B. Whether the State Court's Decision Was Based on an Unreasonable Determination of the Facts under § 2254(d)(2)

Petitioner argues that both the state district court and the Idaho Court of Appeals made an unreasonable determination of the facts by misapprehending a "material factual issue that is central to petitioner's claim." *Taylor*, 366 F.3d. at 1001.

Mistakes are certainly evident in the record. The trial court mischaracterized, or at least embellished, McHugh's testimony regarding his disbarment and found McHugh credible without referring at all to the previous dishonest and fraudulent conduct that led to McHugh's disbarment. In addition, although the Idaho Court of Appeals disagreed with some of the trial court's post-conviction findings as not supported by the record, it went on to make its own mistake of fact.

As noted above, when the Idaho Court of Appeals concluded that Petitioner was not prejudiced by any error by trial counsel, it misstated Ms. Maestas's testimony at the evidentiary hearing. Ms. Maestas testified that the *graduation ceremony ended* "close to 10:00," but the court of appeals believed her testimony to be that Petitioner *left her house* at close to 10:00. Petitioner argues that this was an "unreasonable determination of the facts" because Ms. Maestas clearly did not say what the court thought she did. 28 U.S.C. § 2254(d)(2).

**MEMORANDUM DECISION AND ORDER  23**

It is undisputed that Petitioner was, in fact, at the graduation ceremony for part of the evening, and the timing of his movements was critical. Therefore, in misstating Ms. Maestas's testimony about when Petitioner left her house, the court of appeals was operating under a "misapprehension [that] goes to a material factual issue" central to Petitioner's claim of ineffective assistance. *Taylor*, 366 F.3d. at 1000-01. That factual determination was thus unreasonable under § 2254(d)(2).

Moreover, because the Court cannot definitively determine from the record which of the trial court's findings were rejected by the court of appeals, the Court will not defer to those findings, including the court's determination that McHugh testified credibly as to Petitioner's confession and his reasons for not investigating an alibi defense.[2] *See Frantz v. Hazey*, 533 F.3d 724, 732 n.10 (9th Cir. 2008) (en banc) ("The state trial court's findings . . . were vacated by the state Court of Appeals and thus merit no deference.").

## C.  De Novo Review of Petitioner's Claim of Ineffective Assistance of Trial Counsel

Because the decision of the Idaho Court of Appeals was based on an unreasonable determination of the facts under § 2254(d)(2), the deferential standard found in § 2254(d)(1) does not apply in determining the merits of Petitioner's ineffective

---

[2] Although the Court does not rely on the state court's finding that McHugh was credible, the record seems to reflect that McHugh may have been found credible by default. Even without McHugh's testimony, the trial court could still have found that Petitioner was *not* credible. Petitioner's testimony at the evidentiary hearing contradicted (1) Special Agent Johansson's testimony that Petitioner confessed his involvement in the crimes and (2) the physical evidence that Petitioner was wet from the waist down. When balanced against Petitioner's evidence, McHugh's story seems much more plausible.

**MEMORANDUM DECISION AND ORDER  24**

assistance claim. Rather, the Court must undertake a de novo review of that claim. *See Detrich,* 677 F.3d at 972.

Assuming without deciding that Petitioner's counsel was deficient for failing to present an alibi defense, the Court turns to whether Petitioner has established prejudice on the facts in the record. Because Petitioner did not show he could meet the new evidence standard of § 2254(e)(2) with respect to the recording of the 911 call, he is not permitted to supplement the record with new evidence, as explained above.

After reviewing the record de novo, the Court concludes that Petitioner cannot establish a reasonable probability that, but for trial counsel's failure to investigate, develop, and present an alibi defense, the jury's verdict would have been different. *See Strickland*, 466 U.S. at 694. None of the potential witnessess could testify as to the precise time Petitioner left the graduation ceremony, and only Ms. Maestas estimated the time with any degree of certainty. According to Ms. Maestas, when she and Petitioner left the ceremony together it "[h]ad to be close to 10:00 p.m.," after which they had a 20 to 30 minute argument. (State's Lodging C-4, p. 106.) If that testimony is accurate, Petitioner could not have participated in the crimes, which took place around 10:00.

However, because Ms. Maestas was Petitioner's girlfriend at the time, the jury would have viewed her testimony with a healthy degree of skepticism—as they would the testimony of Petitioner's family. Moreover, Ms. Maestas herself stated she was not paying particular attention to the time. Ms. Maestas's roommate testified that, although she did not know exactly what time Petitioner and his girlfriend came back from the

**MEMORANDUM DECISION AND ORDER  25**

graduation ceremony, she believed it was closer to 9:00 or 9:30, which would have allowed Petitioner time to participate in the robbery. Given the choice between Petitioner's girlfriend and her roommate, particularly with all of the other evidence against Petitioner, the jury would have been much more likely to believe the roommate.

Petitioner was found lying in a field close to where the fleeing suspects had crashed into the irrigation canal, and his two co-defendants (one of whom was wearing a blue bandanna exactly like the one worn by one of the robbers) were found nearby. Petitioner's clothes were wet and muddy, as if he had recently been in the water, but there was no standing water in the field where he was found. Petitioner's claim that his ankles and shins got "a little wet" when he stepped in a ditch on his way to the field would not have helped him; it was contrary to the evidence at trial. The odds that Petitioner just ended up in the same area, at the same time, as two people he knew who were there for different reasons—all of them wet from the waist down and close to a location where three fleeing robbery suspects had crashed their car into an irrigation canal—are close to zero.

With all of this evidence against Petitioner, it is not reasonably probable that the testimony offered by Petitioner's family and girlfriend would have persuaded the jury to believe the alibi defense. This is especially true because the prosecution could have rebutted that defense with Petitioner's confession to Agent Johansson.

For the foregoing reasons, Petitioner has not established a reasonable probability that the verdict would have been different had McHugh put on an alibi defense.

**MEMORANDUM DECISION AND ORDER  26**

**C.      Conclusion**

The Court concludes on de novo review that Petitioner's claim of ineffective

assistance of trial claim fails the prejudice prong of the *Strickland* analysis. Therefore, the

Court will deny the Petition.

## ORDER

**IT IS ORDERED:**

1.      Petitioner's Motion for Order to Augment Lodging of State Court Record

(Dkt. 14) is DENIED.

2.      The Petition for Writ of Habeas Corpus (Dkt. 3) is DENIED, and this entire

action is DISMISSED with prejudice.

3.      The Court does not find its resolution of this habeas matter to be reasonably

debatable, and a certificate of appealability will not issue. *See* 28 U.S.C.

§ 2253(c); Rule 11 of the Rules Governing Section 2254 Cases. If Petitioner

files a timely notice of appeal, the Clerk of Court shall forward a copy of

the notice of appeal, together with this Order, to the United States Court of

Appeals for the Ninth Circuit. Petitioner may seek a certificate of

appealability from the Ninth Circuit by filing a request in that court.

DATED:  **August 27, 2013**



Honorable B. Lynn Winmill
Chief U. S. District Judge

**MEMORANDUM DECISION AND ORDER  28**